**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jared Erwin, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

**INTRODUCTION AND AGENT BACKGROUND**

1.       I am a Special Agent with the Internal Revenue Service–Criminal Investigation, and have been since September 2008.  My training includes six months of training at the Federal Law Enforcement Training Center.  As a special agent, my duties are to investigate potential violations of Internal Revenue laws under Title 26 of the United States Code and other related offenses under Titles 18 and 31 of the United States Code.  In my experience as a special agent, I have investigated numerous financial crimes and been an affiant to and assisted on numerous search and seizure warrants.  Through my training and experience in conducting financial investigations, I know that e-mails are frequently used by individuals to perpetuate financial crimes and that these e-mails can become significant evidence in the investigations.  I have also consulted with other law enforcement personnel with expertise on the use of electronic communications in crimes.

2.       This affidavit is made pursuant to Title 18, United States Code, Section 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), in support of an application for a warrant to search the e-mail account described in Attachment A (hereinafter "SUBJECT ACCOUNT") and all content found therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 208(a) and 216(a)(2) (Acts affecting a personal financial interest),  18 U.S.C. §  666 (Bribes or rewards concerning programs receiving Federal funds),  18 U.S.C. § 201 (Bribery of public officials),  42 U.S.C. § 1320a-7b(b) (Payment and receipt of illegal

remuneration), 18 U.S.C. § 1343 (Fraud by wire, radio, or television), 18 U.S.C. § 1956(a)

(Laundering of monetary instruments),  18 U.S.C. § 1957 (Monetary Transactions in Property

Derived from Specified Unlawful Activity), and 18 U.S.C. § 1347 (Health care fraud)

(collectively hereinafter the "Alleged Violations") committed by Joseph C. Prince and others.

3.     The SUBJECT ACCOUNT at issue is for a business called Crosswalk Consulting

("Crosswalk"), which Prince used in connection with the Alleged Violations.  In short, Prince is

an employee of the Department of Veterans Affairs ("VA"), located in Denver, Colorado, who

worked with beneficiaries in a specific VA health care program.  The investigation to date

indicates there is probable cause, as described below, that Prince used his position to refer

beneficiaries of the program to home health agencies controlled by his friends and family.  He

encouraged overbilling for services provided to those beneficiaries in to enrich his friends and

family, as well as himself through the payment of kickbacks, bribes, gratuities, or rewards from

the home health agencies to himself.  Prince directed the payments to entities he established and

controlled.  Crosswalk Consulting is one of those entities, and Prince used the Crosswalk e-mail

address in execution of the Alleged Violations.

4.     The affidavit is organized as follows: Part I provides a general overview and

background regarding the scheme; Part II provides background on the VA health care benefits

program and the regulations that govern it; Part III explains how Prince made the referrals of

beneficiaries to the home health agencies of his friends and family; Part IV outlines how the

home health agencies made illegal payments to Prince; Part V describes how Prince encouraged

overbilling; Part VI explains the current status of the investigation, including an existing

indictment covering a limited portion of the scheme identified herein; and Part VII identifies the

connection of the SUBJECT ACCOUNT to the investigation.

5.      Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause that evidence, fruits, and instrumentalities of violations of the Alleged Violations are present at the location described.

6.      The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## PROBABLE CAUSE

## I.  OVERVIEW OF THE SCHEME

7.      The matter that is currently the subject of a criminal investigation arose from a referral from representatives of a local bank to IRS-Criminal Investigation. The bank noticed an excessive amount of funds from the U.S. Treasury Department being deposited into accounts that were recently set up by home health care companies Advantage Home Health Agency and Genesis Home Health Agency.  The bank noted that there appeared to be no actual home health care being administered based on the transactions in the business accounts and that a large portion of the funds were being moved to personal bank accounts in which the funds were used for personal expenses.  It was also noted that Advantage and Genesis shared the same residential address at 5877 S. Duquesne Court, Aurora, CO 80016.

8.      Genesis Home Health Agency ("Genesis") is a Colorado limited liability corporation registered with the Colorado Secretary of State on or about August 29, 2016.  The registered agent is Andrew Ssekajja ("Ssekajja"). Ssekajja is the brother-in-law of Joseph C.

Prince.  Ssekajja resided with the Princes at 5877 S. Duquesne Court, Aurora, CO 80016 until March 2018 when he moved to Georgia.

9.      Advantage Home Health Agency ("Advantage") is a Colorado Limited Liability Corporation registered with the Colorado Secretary of State on or about July 31, 2017.   The registered agent is Flavia Nalunga, who was married to Joseph C. Prince in Colorado in 2011. Both Nalunga and Prince reside at 5877 S. Duquesne Court, Aurora, CO 80016.

10.      Joseph C. Prince ("Prince") was employed by the Department of Veterans Affairs since 1995.  From at least October 2016, Prince worked in the Office of Community Care in Denver as a Beneficiary/Provider Relations Specialist for the VA's Spina Bifida ("SB") Health Care Benefits Program.  He was terminated by the VA in mid-August 2018.  Before employment with the VA, Prince served in the U.S. Army from 1979 through 1994.

11.      The VA's SB Health Care Benefits Program provides benefits to certain Korea and Vietnam Veterans' birth children, who had been diagnosed with spina bifida.  This program pays for beneficiaries' health care, including unskilled home health aide services and homemaking services, as discussed further below.  The VA's SB Health Care Benefits Program is a federal health care program under 18 U.S.C. § 24(b).

12.      As a Beneficiary/Provider Relations Specialist, Prince was responsible for maintaining expertise in the benefits program, acting on behalf of beneficiaries and health care providers on questions and issues requiring problem resolution, and coordinating with health care providers to ensure effective claim processing, among numerous other duties.

13.      Beginning in or around June 2017, Prince used his position with the VA to solicit beneficiaries to sign on to receive home health benefits and then structured the home health and homemaking services program to financially benefit himself in three ways: (1) by referring

beneficiaries to a home health agency owned by his wife, (2) by soliciting and receiving bribes or rewards and kickbacks from home health agencies owned or controlled by his associates and to which he referred beneficiaries; and (3) by causing and facilitating overbilling by the home health agencies.

## II.  BACKGROUND AND REGULATIONS REGARDING THE DEPARTMENT OF VETERANS AFFAIRS SPINA BIFIDA HEALTH CARE BENEFITS PROGRAM

14.     The VA provides monetary allowances, vocational training and rehabilitation, and VA-financed health care benefits to certain Korea and Vietnam Veterans' birth children, who have been diagnosed with spina bifida.

15.     The Veterans Health Administration Office of Community Care in Denver, Colorado, manages the VA's SB Health Care Benefits Program, including authorization of benefits and the subsequent processing and payment of health care claims after a determination of eligibility has been made by the Denver, Colorado, VA Regional Office.  For covered benefits, the VA is the exclusive payer for covered services, regardless of any third party insurer, Medicare, Medicaid, health plan, or any other plan or program providing health care coverage. 38 C.F.R. § 17.901 (note).

16.     The Health Care Benefits Program pays for home health services, including the following:

> a.  "Home health aide services," are defined as "providing personal care and related support services to an individual in the home or other place of residence." 38 C.F.R. § 17.900. These services "include assistance with personal care; home management; completion of simple household tasks; nutrition, including menu planning and meal preparation; consumer education; and hygiene education."  *Id.* Home health aide services must be provided according to the individual's written

5

plan of care and must be prescribed by an approved health care provider. *Id.* This is documented on a Form CMS-485 ("Home Health Certification and Plan of Care").

    b.  Homemaker services "may include assistance with Instrumental Activities of Daily Living, such as: Light housekeeping; laundering; meal preparation; necessary services to maintain a safe and sanitary environment in the areas of the home used by the individual; and services essential to the comfort and cleanliness of the individual and ensuring individual safety." *Id.* The law requires that homemaker services must be provided according to the individual's written plan of care and must be prescribed by an approved health care provider. *Id.* Coverage for homemaker services requires preauthorization. *Id.* §17.902. This means coverage will be provided only where it is demonstrated that the care is medically necessary. Preauthorization requests must be made to the Health Administration Center and include the type of service requested, the medical justification, the estimated cost, and the name, address, and phone number of the provider.

17.    Specifically excluded from these types of service are incidental services such as shopping, companion services, and personal attendant services that are not health-related. *Id.* §17.900.

18.    Health care paid for the VA's SB Health Care Benefits Program for these services can be provided by the VA directly, by contract with an approved health care provider, or by "other arrangement with an approved health care provider." 38 C.F.R. § 17.901(c). A provider submits a standard Form 3881 along with an IRS Form W-9 to the VA to be entered into the VA

system as a vendor.  One key piece of information required to become a VA vendor is a National

Provider Identifier ("NPI"). Once entered as a vendor, the provider is able to receive payments.

19.     Payment for services rendered by a provider will be issued when claims are

submitted to the Health Administration Center with all required information, to include dates of

services and all procedures performed. 38 C.F.R. §17.903. A provider can submit claims for

services up to one year after the date of service.  38 C.F.R. §17.903(a)(3). The payment schedule

is set by the VA.  *See* Spina Bifida Health Care Benefits Program Policy Manual, Chapter 3.

20.     VA policy addresses provision of home health services by a family member of the

covered beneficiary in just one circumstance, bowel and bladder care.  Such care is often

required by individuals with SB, and the VA policy provides that such care may either be

provided by a registered health care provider or a "family member who has been trained and

certified by a licensed health care provider."  SB Policy Manual, Chapter 2 and 9.1 (Bowel and

Bladder Care).  Bowel and bladder services provided by a family member are covered up to four

hours each day "when appropriate and supported by medical documentation." Family members

who have been approved to provide this care submit their claims directly to the VA for payment

and are paid approximately $15.50 per hour.  *See* SB Policy Manual, Chapter 3 (referring to

hourly rate paid to nursing assistants in accordance with VA Federal Service General Schedule,

Grade 5, Step 5, basic rate without adjustments).

### III.  PRINCE'S SOLICITATION OF BENEFICIARIES AND REFERRAL TO ASSOCIATED HOME HEALTHCARE AGENCIES

21.     Part of Prince's duties at the VA included fielding calls from SB beneficiaries or

their family members or caretakers.  In this context, either when he received a call from a

beneficiary or caretaker, or when he reached out directly to such individuals, Prince would

inform beneficiaries and/or their caregivers that the beneficiaries were entitled to unskilled home

7

health care through the VA.  Prince would also tell them that the beneficiaries' family or other caregivers could receive payment through a home health care agency for providing home health care and homemaker services to the beneficiary. In some instances, he would also coach them on the number of hours of services they could claim and send prepopulated forms to the beneficiaries identifying the number of hours to provide.  Prince would also have them submit claims for one year retroactive for the same number of hours.  Refer to section V. below for additional information regarding retroactive claim submission.

22.     Prince would then refer the beneficiaries or caretakers directly to a home health care agency ("HHA") that was controlled by his wife or other associates (the "subject HHAs"). The subject HHAs submitted claims totaling millions of dollars to the VA, which the VA paid. The subject HHAs then paid Prince in exchange for the referrals.  Refer to section IV. below for additional information regarding the bribery/rewards/kickbacks scheme.

23.     As part of the investigation, law enforcement agents have listened to numerous phone calls made and received by Prince from his VA office phone, telephone number 303-331-7786.  Because Prince worked in a "call center," all calls made from his work line are recorded in the ordinary course of business. Participants in the call are informed that the call is being recorded.  The recorded calls reflect that beneficiaries and caregivers reach out to Prince for many reasons, to include discussing claims that they have filed or that have been filed on their behalf and making sure they are getting paid appropriately. During these calls, Prince often takes the opportunity to explain the benefits they are missing out on.

24.     Prince tells the caregivers that they can receive the payments discussed above for their caregiving for SB beneficiaries, and that he has a company that he works with often and

knows they are good, or that they pay the most, or other positive reasons for him setting up the beneficiaries with a particular company.

25.     Prince then refers the beneficiaries or caregivers to the subject HHAs. Next, the agencies sign up the caregivers as independent contractors, paying them different rates ranging from $16 to $20 per hour.  The allowable rate to bill the VA is in accordance with published Medicare rates (or CMAC) that are adjusted according to locality. The chart below shows the rates allowable for each of the subject HHAs and what they billed per unit. Each unit represents 15 minutes.

| HHA | Location | Billed/unit | Billed/hour | CMAC 2017 (per unit/per hour) | CMAC 2018 (per unit/per hour) |
|---|---|---|---|---|---|
| Advantage HHA | Aurora, CO | $22.50 | $90 | $24.39 / $97.56 | $35.29 / $141.16 |
| Genesis HHA | Aurora, CO | $22.57-24.39 | $90.28-$97.56 | $24.39 / $97.56 | $35.29 / $141.16 |
| Gracewood HHA | Fort Collins, CO | $22.00 | $88 | $24.39 / $97.56 | $35.29 / $141.16 |
| Legacy HH | St. Petersburg, FL | $21.50 | $86 | $24.39 / $97.56 | $35.29 / $141.16 |
| Regional Home Health Care Systems | Lithia Springs, GA | $22.00 | $88 | $24.39 / $97.56 | $35.29 / $141.16 |

26.     The contract between the HHAs and the independent contractor caregiver is not monitored or regulated by the VA.

27.     In addition to the home health services, beneficiaries are entitled to homemaker services. The CMAC rates for homemaker services for 2017 were $4.88 per unit or $19.50 per hour. The CMAC rates for 2018 were $5.00 per unit or $20 per hour.  In the beginning of the scheme, the subject HHAs submitted claims for both homemaker and home health services. In the later months preceding June, 2018, most of the claims submitted are for home health services only.

28.     Advantage Home Health Agency ("Advantage") is a Colorado Limited Liability Corporation incorporated on July 31, 2017. Advantage established an NPI on August 1, 2017. Advantage submitted its NPI along with a Form W-9 to the VA and was entered as an approved vendor no later than August 28, 2017. The registered agent is Flavia Nalunga Prince ("Nalunga"), Prince's wife, and the registered address (at the time the business was formed) is 5877 S. Duquesne Court, Aurora, Colorado 80016 (Prince's residence).  The business address has since been updated to be a P.O. Box at a UPS Store near the Princes' residence.  Advantage does not have an internet presence such as a website or social media page.

29.     In total, as of August 16, 2018, the VA had paid Advantage approximately $4,335,851 in payments for claims submitted under the VA's SB Health Care Benefits Program.

30.     Upon review of the known bank statements as of June 14, 2018, Advantage did not have any other significant sources of income.

31.     Examples of the referrals made by Prince to Advantage are as follows:

a.  On August 28, 2017, Prince talks to beneficiary E.N. about the benefits he is already receiving through the VA's SB Health Care Benefits Program. E.N. was using a home health agency to provide homemaking services essentially for house cleaning. Prince tells E.N. that he doesn't think that E.N. should continue to use the current homemaker services that he is using because his wife could get paid for the same thing and it would amount to approximately $50,000 per year between the bowel and bladder care (paid as a direct benefit from the VA, as discussed above) and homemaker services rendered (to be billed through a home health agency as an independent contractor). Prince tells E.N. that he should go through a different company to get paid for the homemaker services because the

home health agency E.N. was already using "charges the highest and pays people the lowest." E.N. and Prince discuss Prince sending him the details for the arrangement.

b. In an e-mail dated August 29, 2017, from Joseph.Prince@va.gov to E.N., Prince sends attachments and instructions for completing forms necessary to receive the home health services, specifically the Form CMS-485, Home Health Certification Plan of Care. There are two copies of the form, one for retroactive claims (9/1/2016 through 8/31/2017) and one for claims going forward (9/1/2017 through 8/31/2018). Both forms already had Advantage Home Health Agency prepopulated in the space for the provider's name. Prince's e-mail also stated that he would have Advantage call E.N. about signing a contract.

c. Prince also reached out directly to Advantage via e-mail, directing the home health agency on how to do business. In an e-mail dated August 29, 2017, from Joseph.Prince@va.gov to advantagehha1@gmail.com, Prince wrote:

> *New patient: [E.N.] Sent him the 485's today. Need to send him two contracts and a W9 for his wife to sign and do home health services only, no home maker services. A caregiver is already doing that.*
> *New patient: C.S. Sending 485s today. Keep alive until I get them to understand the program. No more than $15.00 per hour for them.*
> *New patient: T.F. Needs new power wheelchair. Will call them to find out if they need other services…don't do anything yet.*

d. E.N.'s wife signed up as a provider with Advantage, which then submitted claims to the VA for her services.

32.     Genesis Home Health Agency ("Genesis") is a Colorado limited liability corporation incorporated on August 29, 2016. Genesis established an NPI on March 1, 2017. Genesis submitted its NPI along with a Form W-9 to the VA and was entered as an approved

vendor no later than May 15, 2017. The registered agent is Andrew Ssekajja ("Ssekajja"),

Prince's brother-in-law, and the registered address (at the time the business was formed) was

5877 S. Duquesne Court, Aurora, Colorado 80016 (Prince's residence).  The business address

has since been updated to be a P.O. Box at a UPS Store near the Princes' residence.  Ssekajja is a

licensed pharmacist in Colorado. He moved from Colorado to Georgia in March 2018 to work as

a VA employee in the capacity of a pharmacist.  Genesis does not have an internet presence such

as a website or social media page.

33.     In total, as of August 16, 2018, the VA had paid Genesis approximately

$3,199,339 in payments for claims submitted under the VA's SB Health Care Benefits Program.

34.     Upon review of the known bank statements as of June 14, 2018, Genesis did not

have any other significant sources of income.

35.     Examples of the referrals made by Prince to Genesis are as follows:

   a.   On August 3, 2017, Prince speaks with beneficiary S.K. about signing up for

         home health care benefits and tells S.K. that she can get paid for doing what she is

         already doing by signing up with Genesis. Prince shares that Genesis is one of the

         most successful agencies at doing that. It is the only agency that Prince has

         received compliments on. Prince says he will save her the trouble of filling in the

         Form CMS-485 and will e-mail it to S.K. so she can have the doctor sign. Prince

         told S.K. that they can start the home health care claims from the date they started

         the bowel and bladder care, which is April 2017. Prince tells S.K. that she needs

         to fill in the total hours depending on what the doctor says, from 8 to 10 to 12,

         whatever. Prince says the homemaker services are pretty much set at two to three

         hours per day.

b. In an e-mail dated August 4, 2017, from Joseph.Prince@va.gov to S.K., Prince provides S.K. with two separate Forms CMS-485. One covers the homemaker services and the other covers the unskilled home health services. The information is prepopulated on both with Genesis listed as the provider.

c. S.K. submitted the Form CMS-485's with the doctor's signature to Genesis, which started submitting claims on her behalf.

36.    Legacy Home Health, LLC ("Legacy") is a Florida limited liability corporation incorporated on September 25, 2017.  Legacy established an NPI in or around September 2017. Legacy submitted its NPI along with a Form W-9 to the VA and was entered as an approved vendor no later than October 30, 2017. The Registered agent is Roland Vaughn ("Vaughn") at 970 Lake Carillon Drive, Suite 300, St. Petersburg, Florida 33716.  According to commercial law enforcement databases, Vaughn resided at various addresses in the Denver, Colorado, metro area from approximately 1993 to 2018. Vaughn was a real estate agent in Colorado for 15 years and acted as the realtor when Prince purchased his home at 5877 S. Duquesne Court, Aurora, CO 80016 in 2014. Legacy does not have an internet presence such as a website or social media page.

37.    In total, as of August 16, 2018, the VA had paid Legacy approximately $3,039,761 in payments for claims submitted under the VA's SB Health Care Benefits Program as a result of the referrals made by Prince in order to receive kickbacks or other financial incentives from the HHAs.

38.    Upon review of the known bank statements as of August 31, 2018, Legacy did not have any other significant sources of income.

39.    Examples of the referrals made by Prince to Legacy are as follows:

13

a.  In a telephone call on March 6, 2018, Prince tells caregiver L.M. that his main goal is to educate everyone about the benefits the program has to offer and explains to L.M. that she can receive payments for care she already provides. L.M. asks how she can get access to this or who to contact.  Prince informs her that he does all the logistical stuff. Prince says that he knows based on the provider who will best match with the caregiver. Prince says all the home health paperwork goes to Legacy Home Health.

b.  In a telephone call on March 23, 2018, Prince returns a call from L.M. about the log sheets. L.M. says she didn't know how to fill out the dates, so she filled out the date the doctor signed the paper. L.M. sent the paperwork via priority mail. L.M. then mentioned a sticky note attached to the Form CMS-485 forms that said she should get them signed and give to Mr. Vaughn. L.M. was to get three documents signed by the doctor, a Form CMS-485 for last year, a Form CMS-485 for this year, as well as the letter of medical necessity.

c.  S.K. submitted the Forms CMS-485 with the doctor's signature to Legacy, which started submitting claims on her behalf, including a full year of retroactive claims.

40.     The half-sister of Prince, Marcelline Stripling (née McCrea), established three home health agencies in Lithia Springs, Georgia: 1) Regional Home Health Care Systems, LLC incorporated on August 21, 2017, 2) Regional Home Healthcare Systems, North LLC incorporated on February 23, 2018, and 3) Regional Home Healthcare Systems, East LLC incorporated on March 4, 2018 (collectively, these businesses are referred to as "Regional"). Regional submitted its NPIs along with Forms W-9 to the VA and became an approved vendor

no later than September 26, 2017. Regional does not have an internet presence such as a website or social media page.

41.     In total, as of August 16, 2018, the VA had paid Regional approximately $7,169,974 in payments for claims submitted under the VA's SB Health Care Benefits Program.

42.     Upon review of the known bank statements as of June 30, 2018, Regional did not have any other significant sources of income.

43.     Examples of the referrals made by Prince to Regional are as follows:

a.  On April 18, 2018, Congressman John Moolenaar, U.S. Representative for the 4th District in Michigan, received a complaint from E.L. about the VA's SB Health Care Benefits Program in which E.L. wrote the following (in summary):

*Our daughter is in the Spina Bifida Program. The program has a provision to provide health care for her at home for the rest of her life. We were told that we would be paid for this. We signed a contract with a company that would take care of getting us paid, but they didn't tell us that they got to keep 82% and pay us 18% for doing all the work. This is highway robbery.*

The complaint included a copy of the contract and a one page example of an Explanation of Benefits received by E.L. on behalf of his daughter.

b.  E.L. was interviewed by FBI and VA-OIG agents on May 16, 2018. During the interview, E.L. explained how he came to send a complaint to the Representative. E.L. reached out to the VA in October 2016 and received a packet of information including a description of the benefits provided to beneficiaries of the VA's SB Health Care Benefits Program including the home health care benefits from VA employee I.K.

c.  E.L. reached out to the VA again in early 2018 and was told to talk to Prince regarding his questions. Prince explained the program to E.L. When E.L. asked

which company to sign up with, Prince told him Regional because they were the best ones and paid the most.  Prince put E.L. in contact with Marcelline Stripling at Regional who provided the contracts and other paperwork to get started. The contract was between G.L. (E.L.'s wife) and Regional. Regional was going to pay G.L. $16 per hour.

d.  E.L. discussed the contracts and signing up with Regional with both Stripling and Prince. Prince informed E.L. that the VA also allowed to bill for services rendered up to a full year ago.

e.  G.L. completed time sheets for each week starting in or around February 2017 through present for 20 hours per day for care of their daughter and submitted them to Regional.

f.  Upon approval of the claims, the VA sends out an Explanation of Benefits ("EOB"), as they do when patients receive any type of benefit. When E.L. received the first EOBs in April 2018, he noticed that for six days of care in 2017, Regional billed the VA $10,560, but G.L only received $1,920.

g.  E.L. contacted Stripling about the difference.  Stripling told E.L. that Regional had overhead.

h.  On April 3, 2018, E.L. called Prince to complain about the difference.

i.  With respect to separate beneficiaries, as examples:

  i.  In a telephone call on May 10, 2018, a female, C., asks Prince, "you know that lady you set us up with? That Marcelline Stripling?" C. continues to explain that she has not received the check that Stripling was supposed to send her.

ii. In a telephone call on May 10, 2018, a caregiver, J.P., calls Prince to complain about the current company that is submitting claims on their behalf. Prince suggests she call Marcelline Stripling with Regional Home Health Systems.

44. Gracewood Home Health Agency ("Gracewood") is a Colorado limited liability corporation incorporated on November 10, 2017. Gracewood established an NPI on November 16, 2017. Gracewood submitted its NPI along with a Form W-9 to the VA and was entered as an approved vendor no later than December 18, 2017. The registered agent of Gracewood is Glenn Beach at 1281 East Magnolia Street, Unit D, Ft. Collins, Colorado 80524. Glenn's wife, Catherine Beach, is also listed on the Articles of Organization as the person forming the business, Gracewood. According to Colorado Department of Labor, Catherine Beach last received wages from Thompson School District R2J in 2011. Bank records show that she receives income from multi-level marketing schemes as well. Glenn Beach last received wages in Colorado from Wolf Robotics LLC in 2009. Gracewood does not have an internet presence such as a website or social media page.

45. In total, as of August 16, 2018, the VA had paid Gracewood approximately $1,440,512 for claims submitted under the VA's SB Health Care Benefits Program.

46. Upon review of the known bank statements as of June 30, 2018, Gracewood did not receive business income from or have any other source of income during this time-frame.

47. Examples of the referrals made by Prince to Gracewood are as follows:

a. In a telephone call on January 5, 2018, R.A. a caregiver, contacted Prince about the program related to incontinence that Prince had previously mentioned. Prince described the program as "life changing." He told R.A. to "take it, it's there.

17

Because you are a parent, don't apologize for that. It's a lot of money, so that's why they don't ever tell you about it… Imagine 1100 people getting $20,000 up front for bowel and bladder." Prince continued to explain that R.A. would get paid for bowel and bladder care for the entire year prior since they have a year to submit claims.  Prince and R.A. discussed the amount of hours per day that R.A. cares for the beneficiary. Prince explained to R.A. that if she billed for the maximum amount of 18 hours per day, she would receive approximately $300 per day.

Prince asked if R.A. was ok with one of the preferred providers from Colorado and R.A. did not have a preference.  Prince also explained to R.A. that they will bill the time as home health care services because R.A. would get paid more for that than she would if they described the time as homemaker services. Homemaker services only pays $5 per hour, where home health services pay $16 per hour, which is much better.

b.  In an e-mail dated January 16, 2018, from Joseph.Prince@va.gov to R.A., Prince provides R.A. with a prepopulated Form CMS-485, which listed Gracewood as the provider. Gracewood submitted claims on R.A.'s behalf for the period January 1, 2017 through May 26, 2018.

### IV.  ILLEGAL PAYMENT TO PRINCE

48.     Advantage, Regional, Legacy, Genesis, and Gracewood were all established by individuals who had connections to Prince and no apparent prior history with home health.  The companies were all established shortly before beginning to submit claims to the VA, and based

18

on bank records obtained to date, none of the agencies have any income generated through other patients outside of the VA's SB Health Care Benefits Program.

49.     After receiving payments on their claims from the VA, the agencies sent payments to Prince either directly to Prince's personal bank accounts and business accounts controlled by Prince, or indirectly to Prince's wife and children. In total, based on records available as of the various dates listed in the proceeding paragraphs, covering the time period through as recent as June 19, 2018, Prince benefited in the amount of approximately $2.32 million, broken out by HHA below:

    a.  Advantage sent payments of approximately $732,475 to accounts controlled by Prince or related parties, including:

        i.  $568,649 to personal accounts in the names of Prince and Nalunga;

        ii.  $19,500 in wires and cashier's checks payable to Nalunga;

        iii.  $50,000 to a SEP IRA account in the name of Joseph Prince;

        iv.  $50,000 to a SEP IRA account in the name of Nalunga;

        v.  $24,326 check payable to Doctor Fix.  The memo line of the check stated "HVAC Equipment."

        vi.  $10,000 to a savings account in the name of Elijah Prince, Prince's son;

        vii.  $10,000 to a savings account in the name of Elisha Prince, Prince's son.

    b.  Legacy transferred or credited approximately $1,007,205 to accounts in the name of Crosswalk Consulting LLC and controlled by Prince.  Crosswalk is a Colorado limited liability corporation incorporated on November 6, 2017.  The registered agent is Joseph Prince.

c. Roland Vaughn executed a check payable to Joseph Prince in the amount of $2,000.

d. Gracewood sent approximately $519,572 to accounts held in the name of Crosswalk.

e. Regional transferred or wired $26,000 to an account in the name of Great ExpecTastings Catering ("GETC").  GETC is a Colorado limited liability corporation incorporated on December 11, 2015.  The registered agent is Joseph Prince.  Prince is the sole signatory on the bank account.

f. Regional executed a check payable to Venture Homes Inc. in the amount of $3,930.  The memo on the check stated "Upgrades Lot 121 Barrington, Joseph & Flavia Prince."

g. Regional executed a check payable to Venture Homes Inc. in the amount of $10,107.  The memo on the check stated "Venture Homes upgrades on #121 BT for Joseph C. Prince."

h. Genesis executed a check payable to Nalunga in the amount of $12,883.

i. Andrew Ssekajja executed a check payable to Nalunga in the amount of $6,100.

50.    Prince had a discussion on his recorded work line with Vaughn (of Legacy) regarding such payments.  In a telephone call on March 2, 2018, Vaughn asks Prince if he can speak freely and begins to say, "I sent 30 and 45." Prince then says, "Not on this line."  On March 1, 2018, there was a $30,000 ACH from Academy Bank account ending 91094 registered to Legacy Home Health, LLC, with the description, "Legacy Home Heal Joe Prince 107001481." Per ACH detail, the beneficiary account was a JP Morgan Chase account ending 07280 in the name of Crosswalk Consulting.  On March 2, 2018, there was a $45,000 ACH from Academy

Bank account ending 91094 registered to Legacy Home Health, LLC with the description, "Legacy Home Heal Joe Prince 107001481."  Per ACH detail, the beneficiary account was a JP Morgan Chase account ending 07280 in the name of Crosswalk Consulting.

## V. HEALTH CARE AND WIRE FRAUD

51.     From June 1, 2017, to June 30, 2018, the VA paid out approximately $25.2 million to a combination of 59 home health care agencies for the VA's SB Health Care Benefits Program. Of the total, approximately $18.9 million was paid to the five companies to whom Prince made referrals: Advantage, Genesis, Regional, Legacy, and Gracewood.

52.     In addition to the referral process already discussed, two factors are notable regarding the disproportionate payment to the Prince-associated entities: 1) hours inflation, and 2) retroactive claim submission.

     a.   The subject HHAs submit claims ranging from 4 hours per day to 20 hours per day. The claims submitted by the subject HHAs are often for 18 to 20 hours of health care services per day, and the majority are for more than 8 hours per day. In addition to these "home health" hours, the same caregiver that contracts with the HHA often receives an additional four hours per day of compensation for providing the bowel and bladder care, discussed above.  Thus, many caregivers are billing for 24 hours per day of caregiving services.  It appears other HHAs are submitting claims for fewer hours than the subject HHAs and include homemaker services, which are billed at a lower rate.

     b.   Once a new beneficiary is signed up by the subject HHAs, they submit retroactive claims for a full year prior for the same number of hours per day.  It does not appear that the other HHAs submit claims for prior services.

53.     As identified above, the regulations governing the VA's SB Health Care Benefits Program provide that only certain types of services are covered.  The regulations enumerate the types of services covered, such as assistance with personal care and meal preparation. These specific tasks are compensated on a quarter-hour basis, indicating that an accounting of time for each specific service is necessary.  The regulations also specifically exclude services such as "companion services" and personal attendant services that are not health related.

54.     Nevertheless, Prince encouraged beneficiaries and caregivers to whom he spoke to bill for time above and beyond what would be spent on enumerated tasks.  For example:

    c.     Prince spoke with beneficiary, E.N., identified above. Prince asked E.N. who his primary caregiver was, and E.N. replied, "myself."  E.N. runs a pool cleaning business and prior to talking to Prince was using home health services only for weekly cleaning of his home.  Prince recommended that E.N.'s wife begin providing homemaking services and be paid for them through a home health agency. Prince sent E.N. a prepopulated Form CMS-485 with Advantage filled in as the provider. In the cover e-mail, Prince stated that he added a space for the doctor to indicate how many hours per day, stating it was a "(minimum 8, up to 24)." There is no minimum hour requirement for home services.  Homemaker services are to be billed separate from home health, at a lower rate, and are not included as part of home health services.  The HHA submitted claims for home health services for E.N.'s caregiver, not homemaker services.

    d.     On September 20, 2017, E.N. called Prince to discuss the forms and ask what needs to be signed by the doctor. Prince says, "Home health pays through a provider 16 an hour for 8 hours a day." E.N. says, "That's the grooming," and

Prince responds, "yes, and like I told you, I don't care whether she does it or not, you get paid for that sir, so don't leave the money on the table. So she grooms you." Prince continues, "I am not saying cheat, but I'm saying do what Philip Rivers does, cheat all the time."

e.  In a telephone call on March 6, 2018, Prince asks caregiver L.M. how many hours a day she is comfortable leaving the beneficiary by himself. L.M. says that she does not leave him alone. Prince says, "So that means 24 hours a day." L.M gets one of the kids to stay with him or takes him with her. Prince told her he would fill in the (Form) 485 safely with up to 20 hours per day, but there would have to be two people on the contract with the HHA.

55.     In a case where a caregiver is being paid for four hours a day for bowel and bladder care, claiming an additional 20 hours a day of home health aide care is simply not possible and does not allow for sleep, grooming, and care of one's individual self.

56.     This fraud on the program was also carried out through the one-year retroactive claims submission.  Once a caregiver was signed up through an HHA, the HHA, with Prince's assistance, would submit claims for the same number of hours for a full year.  Such retroactive claims could result in a payment of up to $500,000 or more to the HHA for one beneficiary.

57.     As a provider of home health care services, it is the responsibility of the HHAs to submit claims to the VA. The HHAs take the caregiver's hand-written hours log, convert the hours to billable units, and submit the claims to the VA.  In order to receive payment from the VA, the submitted claims form needs to include an approved vendor, the correct beneficiary, and correct codes for the equipment or services received. This must all match the Form CMS-485

signed by the doctor. The amount of hours billed must also be less than or equal to the doctor's orders on the Form CMS-485.

## VI.  INDICTMENT AND ONGOING INVESGIATION

58.     On June 21, 2018, Joseph Prince was indicted on seven counts of violating Title 18 U.S.C. §§ 208(a) and 216(a)(2) (Acts affecting a personal financial interest).  *See* 18-cr-00300-MSK.  The indictment alleges that between September 11, 2017, and June 1, 2018, the VA paid Advantage approximately $4.3 million for claims associated with services provided to SB beneficiaries.  The indictment alleges that Prince willfully participated personally and substantially as a Government employee through recommendation, the rendering of advice, and otherwise, in a particular matter in which to his knowledge his spouse had a financial interest, namely, through recommendation, referral, and direction that SB beneficiaries and SB beneficiary caretakers use Advantage in connection with home health and homemaking services, and for submitting claims to the VA for such services, provided for the benefit of several SB beneficiaries.

59.     On June 22, 2018, Prince was arrested and consented to a custodial interview with an FBI and VA-OIG Special Agent.  During the interview, Prince stated the he approached his wife, Flavia Nalunga Prince, about opening up a home health agency since she had experience in the medical field.  Prince told the agents that he did not want to be associated with Flavia's business.  Prince acknowledged referring SB Beneficiaries to certain HHAs and did so because he knew which companies would not take advantage of them.  Prince also confirmed having a relationship with Gracewood Home Health Agency, but declined to elaborate on what kind of relationship or his relationship with other subject HHAs.

60.     Prince explained that he thought he was providing more benefit to the beneficiaries and caregivers by sending them to companies that were going to pay them more for the same services.  He stated that most companies pay around $8 per hour for unskilled home health care and Advantage paid $16 per hour.

61.     Additionally, the owners of the subject HHAs were contacted by law enforcement and interviews were conducted.

62.     On June 22, 2018, Glenn Beach was interviewed by law enforcement agents. Beach stated that around October 2017, Prince approached him and Catherine Beach about acting as a liaison with families that needed assistance.  As a result of Prince's proposal, the Beaches established Gracewood and began submitting claims to the VA on behalf of SB beneficiaries.  Beach told law enforcement that he believed it appropriate to pay Prince a commission and that Prince told Beach that fifty percent was customary.  Since founding Gracewood, Beach estimated that he paid Prince $500,000 in commission.  Prince directed Beach to make the commission payments to Prince's consulting company, Crosswalk Consulting, and that Prince e-mailed Beach the bank account numbers.  Beach acknowledged communicating with Prince regarding Gracewood matters via e-mail and that he primarily sent e-mails to Prince's VA e-mail address.

63.     Beach made a consensually monitored phone call to Prince at the conclusion of the interview.  During the call, Prince acknowledged receiving the commission payments from Beach and that the arrangement was to help both Prince and Beach to get out of their current financial mess.  Prince also acknowledged that his role in the scheme was "dicey" and that he does not know if the arrangement is legal, stating, "It may not be".  Referring to the commission, Prince stated that at first fifty percent sounded good, but ten percent may be more reasonable to

avoid scrutiny from a financial person such as an accountant doing Gracewood's financials. Later in the conversation, Prince told Beach that when you're dealing with this kind of money, "all it takes is one person to say something and that's the end of it for everybody".  Prince told Beach that Gracewood's business is legal and the only questionable part is Prince's role in it. Asked by Beach if he had a conflict of interest, Prince replied, "Personally, no. Professionally…I believe it would be."  Prince went on to tell Beach that "everything is fine if nobody finds out".  At the end of the conversation, Prince alluded to changing the arrangement to tone down the appearance of his involvement and avoid putting Beach in a bad position.

64.      On June 22, 2018, Roland Vaughn, the owner of Legacy Home Health, was interviewed by law enforcement agents at his residence in Florida.  Vaughn told law enforcement that Prince helped him set up Legacy and that Prince referred all six of the SB Beneficiaries that Legacy submitted benefits for to the VA.  Vaughn stated that Prince directed him to pay Prince forty percent of Legacy's net profit.  The payments were made to Prince's company, Crosswalk Consulting.

65.      On June 25, 2018, Marcelline Stripling was interviewed by law enforcement agents at her residence in Georgia.  Marcelline stated that Prince introduced her to the idea of starting Regional.  Prince referred all of the SB beneficiaries to Regional.  While operating Regional, Marcelline paid $26,000 to Prince which she described as payment for catering services and that Prince sent food to Georgia from Denver.  Marcelline later retracted that statement and told law enforcement that the money paid to Prince was a gift.  Prince directed her to pay the money to a bank account in the name of Great ExpecTastings Catering, a company owned and controlled by Prince, and provided her with the routing and account number.

Marcelline denied ever having a conversation with Prince about paying him for the referrals he made to Regional.

66.     On May 16, 2018, caregiver E.L. was interviewed by FBI and VA-OIG Special Agents.  E.L. told the agents that he did not question billing for 20 hours per day of home health care because his daughter, the SB Beneficiary, needed to be accompanied 24 hours per day. Being able to bill for an additional four hours per day of bowel and bladder care seemed appropriate to E.L. as well.

67.     On August 6, 2018, beneficiary M.E. and caregiver J.M. were interviewed by law enforcement agents. M.E. and J.M. were told by Prince to charge for the maximum number of hours that the doctor said M.E. was eligible for even if J.M. was not actually providing care for that many hours. M.E. and J.M. had independent conversations with Prince on the matter.

68.     On August 10, 2018, caregiver A.T. was interviewed by law enforcement agents. A.T. said that Prince would explain to her that it was a shame that A.T. just started receiving these benefits despite having cared for her son for his whole life. Prince told her to charge the maximum number of hours even if she didn't work them because she needed to make up for lost time.

69.     The majority of the beneficiaries involved with the subject HHAs have been interviewed at this time.  These beneficiaries are located across the United States and many were interviewed by agents who are not active participants in this investigation.  When asked by the agents if they were ever encouraged to inflate the hours they reported on their time logs to the HHAs, some caregivers responded that they received no such pressure.  Based on the review of recorded calls, e-mails, and interviews to date, it appears that the beneficiares were not informed

about what types of services were actually billable as home health services, nor that they were to record their time performing the specified tasks in 15-minute increments.

70.     During the timeframe of the alleged scheme, financial transactions out of the Crosswalk Consulting bank accounts controlled by Prince included:

    a.  $304,000 in transfers to personal bank accounts in the name of Prince and Nalunga;

    b.  $135,228 in payments to organizations related to Pastor Chris Hill;

    c.  $58,000 in wire transfers to Timothy St Cyr, a half-brother of Prince;

    d.  $50,000 deposit to a Simplified Employee Pension (SEP) IRA account in Prince's name;

    e.  $30,000 to individuals associated to The Potter's House of Denver, a local church that Prince was a member;

    f.  $23,000 in wire transfers to Peter Prince, a brother of Prince;

    g.  $16,350 in payments towards the loan on a 2011 Toyota Sienna passenger van registered in Prince's name;

    h.  $15,452 in payments towards student loans;

    i.  $13,000 in deposit to a Betterment Wealth Builder Account in Prince's name;

    j.  $13,000 in wire transfers to Jason Prince, a relative of Prince;

    k.  $9,800 in wire transfers to Ghazi Marketing, a company located in Trinidad and Tobago;

    l.  $7,500 payment to Venture Homes as earnest money towards the purchase of a newly constructed home at 2348 Barrington Trace Circle, Atlanta, GA 30331;

    m.  $6,939 payment to Marc Lichtenfeld, author and Chief Income Strategist for the Oxford Club;

    n.  $5,037 to Goldline, a dealer in precious metals; and

    o.  $5,000 wire transfer to June St Cyr, a relative of Prince.

71.    The investigation of Prince and others associated with the scheme is ongoing.

## VII.  USE OF CROSSWALK CONSULTING E-MAIL ACCOUNT

72.    E-mail communications provided in response to subpoenas issued to the various subject HHAs in this case show that Prince communicated with others associated to this investigation via the Crosswalk e-mail address, crosswalkconsulting100@yahoo.com, in order to direct payments to Crosswalk, advise on setting up the HHA business, communicate the status of beneficiary contacts, discuss how to fill out forms for submittal to the VA's SB Health Care Benefits Program, and refer new beneficiaries to a subject HHA.  Examples include:

    a.  On January 31, 2018, an e-mail was sent from the Crosswalk e-mail address to Roland Vaughn of Legacy with a copy of a blank check from Crosswalk's JP Morgan Chase account ending 07280 as an attached file to the e-mail.  Bank records show that from February 2, 2018 thru June 1, 2018, Legacy made approximately $727,761 of payments to this bank account of Crosswalk.

    b.  On November 17, 2017, Cathy Beach of Gracewood sent an e-mail to Prince at the Crosswalk e-mail address with two document attachments: 1) blank time log and 2) blank activity log.  The email subject line was *Updated Activity Logs* and the e-mail stated:

*Dear Mr. Prince,*
*Please find updated Time and Activity logs.  We got a new number dedicated to Gracewood Health.  The ONLY [sic] changes to the forms are the phone number and FAX [sic] number.  Independent Contractor Agreement will be complete this*

29

*evening and I will send them as email attachments.  The NPI and EIN numbers are complete.  The bank account is complete.  Is there anything else we need to do before meeting with you? ....*

Later on November 17, 2017, a response is sent from the Crosswalk e-mail

address to Cathy Beach stating:

*Good morning Mrs. Beach,*
*Thanks for the submission.  The daily lgs [sic] should delineate [sic] homemaker services from home health services and should be indicated in the title.  Did I send you a homemaker sheet as well?  Next, please change meal preparation on the form to meal planning.  I'd like to see the patient sign or initial but not both.  This would be too hard on them.  More to come.*

c.   On January 2, 2018, Cathy Beach of Gracewood sent an e-mail to Prince at the

Crosswalk e-mail address with a subject line titled *Accounting*.  The e-mail stated:

*Good Afternoon Mr. Prince,*
*Our accounting department appears to have incorrect information regarding your routing and account number....*

Later on January 2, 2018, a response is sent from the Crosswalk e-mail address to

Cathy Beach with a routing and account number for an Academy Bank account

ending 701088 registered to Crosswalk Consulting, LLC and controlled by Prince.

Bank records show that from January 2, 2018 thru January 5, 2018, Gracewood

made approximately $10,417 of payments to this bank account of Crosswalk.

d.   On January 4, 2018, Cathy Beach of Gracewood sent an e-mail to the Crosswalk

e-mail address with a subject line titled *Idea*.  The e-mail stated:

*How about I text you the simple letters "ec" to let you know I sent u [sic] an email to this address?  Or any other suggestion you might have...[sic]*

Later on January 4, 2018, a response is sent from the Crosswalk e-mail address to

Cathy Beach stating:

*No.  Sometimes I forget to answer timely…[sic] What you're doing is fine.*

e.   On January 7, 2018, Cathy Beach of Gracewood sent an e-mail to Prince at the

Crosswalk e-mail address with a subject line titled *Update*.  The e-mail stated:

*Mr. Prince,*
*All materials have been sent.  She should receive them Monday morning before*
*10:30 am.  I sent a return envelope for her use.  (Also an overnight envelope)  I*
*will give her a followup [sic] call tomorrow to confirm she got them and see if she*
*has any questions.  I still need a form 485 from you as well.  I AM GRATEFUL*
*[sic] for all you do!*

f.   On February 25, 2018, Cathy Beach of Gracewood sent an e-mail to Prince at the

Crosswalk e-mail address with a subject line titled *New Time sheets for Rhonda*

*Alexander.*  The e-mail stated:

*Good morning Joe,*
*Can you please provide guidance on how to proceed with resubmittal of the*
*Activity Logs?*
*I am concerned that the activity log that is prefilled with the x's might be rejected*
*because it is not handwritten.  I believe you and Glenn thought this would*
*probably be acceptable.  However, I am a bit anxious and wanted to send you a*
*preview of what the forms look like before sending on to Rhonda.*
*I am happy to hand write the x's in appropriate columns myself so Rhonda*
*doesn't have to do all this!*
*We are thinking that she can simply fill in the upper rows of time in/time out and*
*total daily hours log, thus reducing the amount of work she has to do on her end.*
*At the same time I want to ensure we are doing our best to get these forms*
*accepted by the V.A.. [sic] I greatly appreciate your time.*
*I will contact Rhonda and walk her through the process of filling out the time*
*in/time out format of the resubmittal once we know which is the best way to*
*proceed.*

g.   On March 13, 2018, an e-mail was sent from the Crosswalk e-mail address to

Cathy Beach of Gracewood with an attachment (Note: The attachment was not

produced to the government in the subpoena records production by Gracewood).

The e-mail stated:

*New beneficiary.  Expecting your call on Thursday of this week.*

31

Later on March 13, 2018, Cathy Beach responds to the Crosswalk e-mail address and states:

*I assume you'll give me a bit of background before I call?  (Or not…) [sic]  Adam is the client and Linda is his mother/caregiver.  I look forward to talking with her…*

73.     The above usage of the Crosswalk e-mail account to communicate with others associated to this investigation gives probable cause to believe that the e-mail account contains further evidence.

74.     In general, an e-mail that is sent to a Yahoo subscriber is stored in the subscriber's "mail box" on Oath Holdings, Inc. (formerly Yahoo Holdings, Inc.) servers until the subscriber deletes the e-mail.  If the subscriber does not delete the message, the message can remain on Oath Holdings, Inc. (formerly Yahoo Holdings, Inc.) servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Oath Holdings, Inc.'s servers for a certain period of time.

75.     On May 24, 2018, a preservation request was submitted to Oath Holdings, Inc. to preserve the contents of the SUBJECT ACCOUNT "mail box" for 90 days.  On August 14, 2018, an additional preservation request was submitted to Oath Holdings, Inc. (formerly Yahoo Holdings, Inc.) to extend the preservation of the "mail box" for an additional 90 days.  The preservation number is 285924.  The preservation request expires on November 14, 2018, and cannot be renewed.

76.     Your affiant has spoken to an employee of Oath Holdings, Inc. (formerly Yahoo Holdings, Inc.) and confirmed that the SUBJECT ACCOUNT is indeed maintained by Oath. The Oath employee provided your affiant with the preservation number that Oath assigned in response to the preservation requests for the SUBJECT ACCOUNT.

32

## **BACKGROUND REGARDING THE INTERNET**

77.     As part of my training, I have become familiar with the Internet (also commonly known as the World Wide Web), which is a global network of computers and other electronic devices that communicate with each other using various means, including standard telephone lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions, including satellite.  Due to the structure of the Internet, connections between computers on the Internet routinely cross state and international borders, even when the computers communicating with each other are in the same state.   Individuals and entities use the Internet to gain access to a wide variety of information; to send information to, and receive information from, other individuals; to conduct commercial transactions; and to communicate via electronic mail ("e-mail").  An individual who wants to use Internet e-mail must first obtain an account with a computer that is linked to the Internet—for example, through a university, an employer, or a commercial service—which is called an "Internet Service Provider" or "ISP" (see definition of "Internet Service Provider" below).  Once the individual has accessed the Internet, that individual can use an e-mail account provided by their ISP or they can use the Internet to connect to public web-based e-mail services to send and receive e-mail.  Web-based e-mail services provide e-mail accounts that may be accessed from any computer that has access to the Internet.  In addition, the individual can access websites using web browsers to view or download content, or make purchases.   The Internet may also be used to access online groups such as chat rooms, websites, social media, newsgroups and video conferencing.

78.     **E-mail Provider**:

A.  In my training and experience, I have learned that Oath Holdings, Inc. (hereinafter "Provider") provides a variety of on-line services, including

electronic mail ("e-mail") access, to the general public.  Subscribers obtain an account by registering with Provider.  During the registration process, Provider asks subscribers to provide basic personal information.  Most public providers do not validate the information provided, however.  Nevertheless, the computers of Provider are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Provider subscribers) and information concerning subscribers and their use of Provider services, such as account access information, e-mail transaction information, and account application information.

B.   In general, an e-mail that is sent to a Provider subscriber is stored in the subscriber's "mail box" on Provider servers until the subscriber deletes the e-mail, or until a preservation letter is sent to the e-mail provider.  If the subscriber does not delete the message, or if the e-mail provider preserves the content of the account pursuant to a preservation letter, the message can remain on Provider servers indefinitely.

C.   When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Provider servers, and then transmitted to its end destination.  Provider often saves a copy of the e-mail sent.  Unless the sender of the e-mail specifically deletes the e-mail, or if the e-mail provider preserves the content of the account pursuant to a preservation letter, the e-mail can remain on the system indefinitely.

D.   Provider subscribers can also store files, including e-mails, address books, contact or buddy lists, pictures, and other files, on servers maintained and/or

owned by Provider.

E.   When subscribers sign up for a Yahoo email account with Oath Holdings, Inc., they can also sign up for a Yahoo Account or use other Yahoo services such as Yahoo Calendar, Yahoo Answers, Yahoo Address Book, Yahoo Messenger, Yahoo News and many other services.  Oath Holdings, Inc. discusses the services it offers and explains to its customers and potential customers about the information it collects from the use of those services in its privacy policy.  That privacy policy is available online at https://policies.oath.com/us/en/oath/privacy/index.html.  I intend for that policy and the policies it references to be incorporated into this affidavit by reference rather than repeating here all of the services and information it collects in the amount of detail that policy sets forth.

79.   **Internet Protocol Address ("IP Address")**: Every computer or device on the Internet is referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An IP address is a series of numbers separated by periods; an example of an IP address is 192.168.10.102.  Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address.  A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISPs employ dynamic IP addressing, that is they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet.  A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records.  Typically, users

who sporadically access the Internet via a dial-up modem will be assigned an IP address from a pool of IP addresses for the duration of each dial-up session.  Once the session ends, the IP address is available for the next dial-up customer.  On the other hand, some ISPs, including most cable providers, employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer.  In other words, a static IP address is an IP address that does not change over a period of time and is typically assigned to a specific computer.  A modem is an electronic device that allows one computer to communicate with another.

80.     A host computer is one that is attached to a dedicated network and serves many users.  These host computers are sometimes commercial online services, which allow subscribers to connect to a network, which is in turn connected to their host systems.  These service providers allow electronic mail service between their own subscribers, and those of other networks or individuals on the Internet.

81.     Some of these systems offer their subscribers the ability to communicate publicly or privately with each other in real time in the form of "chat rooms."  Contact with others online can be either open and anonymous, or private and personal in the form of person-to-person instant messages.

82.     Further, the online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  These online storage accounts are often free but can involve a charge.  A subscriber assigned a free online storage account frequently can set up such accounts by providing limited identifying information.  Such a subscriber can collect, store, view and

distribute electronic files directly from the online service. The subscriber can also manipulate the files on an online storage service from any computer connected to the Internet.

## EVIDENCE

83. I know from training and experience that persons engaged in the Alleged Violations often communicate with others through correspondence or other documents (whether digital or written) which could tend to identify the subject and other conspirators.

84. I know from training and experience that the complete contents of e-mail accounts may be important to establishing the actual user who has dominion and control of an e-mail account at a given time. E-mail accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider. They may also be used by multiple people. Therefore, the content of a given account, including the e-mail accounts that send messages to a given account often provides important evidence regarding the actual user's dominion and control of an e-mail account.

85. I know from training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or code words (which require entire strings or series of e-mail conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of an e-mail or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and paren ":)" to convey a smile or agreement) to discuss matters. Keyword searches would not account for any of these possibilities, so actual review of the contents of an e-mail account by law enforcement familiar

with the identified criminal activity is necessary to find all relevant evidence within the account.

86.     I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. I advise it would be impractical and infeasible for the Government to review records produced by a Service Provider and keep only such records as the Government finds to be related to the offenses described herein and in Attachment B during a single analysis.   I have learned through practical experience that various e-mails often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between e-mail threads, and any respective attachments, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. I have learned from that experience, as well as other investigative efforts, that multiple reviews of the activity in the account at different times is necessary to understand the full value of the information contained therein. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the e-mails and data must be assessed within the full scope of the investigation.  As

such, I respectfully request the ability to maintain the whole of the data provided by the Service Providers, and to review the communications in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the mirrored images in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

87.    This application seeks a warrant to search all responsive records and information under the control of Oath Holdings, Inc., a provider subject to the jurisdiction of this court, regardless of where Oath Holdings, Inc. has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Oath Holdings, Inc.'s possession, custody, or control.

## REQUEST FOR NON-DISCLOSURE AND TO KEEP ACCOUNT ACTIVE

88.    Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), I request the Court order Oath Holdings, Inc. not to notify any other person of the existence of this warrant.  This request is made because notification of the existence of the warrant will result in the possible flight from prosecution, destruction of or tampering with evidence, and/or further colluding with conspirators and other associated to this investigation.

89.    Because the investigation is ongoing, I would further request the Court to order Provider to continue to maintain the account further detailed in Attachment A, in an open and active status.

## CONCLUSION

90.    This Court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

91.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the Alleged Violations may be located within the e-mail account described in Attachment A.

92.     I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

Respectfully submitted,

*/s/ Jared Ewrin*
Jared Erwin
Special Agent
Internal Revenue Service – Criminal Investigation

Submitted, attested to, and acknowledged by reliable electronic means on November _____ 14 _____, 2018.

UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Anna Edgar, Assistant United States Attorney.